IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00460-RWS |
| | ) | |
| THE CITY OF ST. ANN, MISSOURI, | ) | JURY TRIAL DEMANDED |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENED COMPLAINT

COMES NOW Plaintiff Michelle Woods, individually and on behalf of the heirs at law of Henry Griffin, deceased, and for her First Amended Complaint against Defendants states as follows:

## Parties and Jurisdiction

1. Plaintiff Michelle Woods (hereinafter "Woods") is the natural mother of Henry Griffin (hereinafter "Griffin"). She is the appropriate party to bring this action on her own behalf and the other heirs at law of Griffin pursuant to § 537.080.1 R.S.Mo.

2. Defendant City of St. Ann, Missouri (hereinafter "City" or "St. Ann"), is a municipal corporation organized and existing under the laws of the State of Missouri. It operates the St. Ann Jail Facility (hereinafter "Jail") through the St. Ann Police Department.

3. On or about August 19, 2016, St. Ann and other municipalities were sued for operating debtors' prisons, as well as the conditions of their jails. Ultimately, issues related to the conditions of the St. Ann Jail, to include but not be limited to the failure to provide vital

medical care and prescription medications was litigated in a separate lawsuit styled *Walker et al.*
*v. City of St. Ann, Missouri*, Case No. 4:18-cv-1699. The City settled the lawsuits against it for
over 3 million dollars in October 2023.

4.     On August 22, 2022, Katherine Pinson died at the Jail due to the City and its
employees/agents' failure to provide her with adequate medical care.

5.     Defendant St. Ann also is responsible for the death of Griffin, which was caused
by the intentional acts or omissions of its employees/agents, who were acting under color of state
law, and/or whose acts and/or omissions were taken as agents/employees of Defendant City in
the course and scope of their employment.

6.     Defendant St. Ann also is responsible for the death of Griffin because it explicitly
or implicitly adopted and/or implemented customs or practices that, among other things, allowed
corrections officers and their supervisors with no or inadequate training to deny necessary
medical treatment to inmates with serious medical needs, even against medical advice, to include
but not be limited to Griffin. Additionally, it has adopted customs and practices that allow City
employees to ignore the needs of inmates and/or fail to properly monitor inmates to ensure their
health and wellbeing. These customs and/or practices, as well as the inadequate supervision and
training of the City's employees, showed a deliberate indifference to the serious medical needs
of Griffin.

7.     Defendant Chief Aaron Jimenez (hereinafter "Jimenez") is and was at all times
relevant herein the City's Chief of Police. Upon information and belief, as the City's Chief of
Police he was the final policymaker for the City of St. Ann with respect to the operation of its
Jail. He has final supervisory authority for officers at the St. Ann Jail and failed to provide
adequate supervision and training to prevent Griffin's death. He is sued in both his official and

individual capacities.

8.      Defendant Stefan Logan is and was at all times relevant herein a supervisory corrections officer at the St. Ann Jail, who failed to provide adequate supervision or training to prevent the death of Griffin.  He is sued in both his official and individual capacities.

9.      Defendant Lt. David Campos, Jr., is and was at all times relevant herein a police lieutenant employed by the City, who failed to provide adequate supervision to prevent the death of Griffin.  He is sued in both his official and individual capacities.

10.     Defendant Sgt. Gary Schwenk is and was at all times relevant herein a supervisory road officer employed by the City, who failed to provide adequate supervision to prevent the death of Griffin.  He is sued in both his official and individual capacities.

11.     Defendant Sgt. Brandon Means is and was at all times relevant herein a supervisory road officer employed by the City, who failed to provide adequate supervision to prevent the death of Griffin.  He is sued in both his official and individual capacities.

12.     Defendants Nicholas Ostoff (hereinafter "Ostoff"), Robert White (hereinafter "White") Christopher Cox (hereinafter "Cox"), Justin Lawrence (hereinafter "Lawrence"), Richard Evans (hereinafter "Evans"), Glenn Bedsworth (hereinafter "Bedsworth"), and Michael Miller (hereinafter "Miller") were at all times relevant herein correctional officers employed by the City, who were working at the time of Griffin's incarceration and could have prevented his death.  They are sued in both their official and individual capacities.

13.     This action is brought pursuant to the 8th and 14th Amendments of the U.S. Constitution, and 42 U.S.C. §§ 1983 and 1988, as well as the Constitution and laws of the state of Missouri.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising

under state law pursuant to 28 U.S.C. § 1367.

14. At all times relevant herein, Defendants were acting under color of state law.

15. The acts or omissions alleged herein caused the death of Griffin while he was in the custody of the Jail, which is located in St. Louis County, Missouri, in the Eastern Division of the Eastern District of Missouri.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as the district in which a substantial part of the events or omissions giving rise to the claims occurred.

17. Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## Facts Common to All Counts

18. On September 20, 2022, Griffin was arrested by the St. Ann Police Department and taken to the St. Ann Jail.

19. Griffin was booked into the St. Ann Jail on September 21, 2022. During the booking process, Griffin was highly agitated and was making suicidal statements in the presence of Cox and White.

20. According to Jail policy, a fit for confinement is supposed to be obtained before an inmate is booked into the Jail or held for interrogation when the arrestee may possibly be suffering from a drug overdose, exhibits symptoms of severe mental disorder, or talks about committing suicide. Upon information and belief, it is the custom and practice of the Defendants to ignore these written policies with the knowledge and consent of Jimenez and the other supervisory defendants.

21. Cox and White informed supervisors, Logan and Campos about Griffin's suicidal statements.

22. Both Defendants Logan and Campos instructed Cox and White that Griffin was to

remain in jail.

23.     Instead of obtaining proper medical treatment for Griffin, who was highly agitated and suicidal, at approximately 2:00 a.m., Cox and White placed Griffin in a restraint chair for about 2 hours.  At approximately 4:00 a.m., Griffin was removed from the restraint chair and secured to a bench in the booking area.

24.     At approximately 3:00 a.m. Griffin informed White that he was dope sick, meaning he was experiencing withdraw symptoms.  Still no medical care was provided.

25.     While secured to the bench in the Sally Port, Griffin continued to be agitated, he was highly belligerent, was kicking the bench and booking desk, and screaming.  Griffin told Lawrence he needed to see the paramedics.

26.     Griffin was not provided with the medical care he requested and obviously needed.

27.     Instead of being provided proper medical care and treatment, Griffin was placed in a cell at approximately 8:46 a.m.

28.     Jail policy requires corrections officers to conduct face-to-face visual observations of prisoners every 30 minutes and to use the audio/video monitors between the 30-minute visual observations.

29.     With the knowledge and consent of the supervisory Defendants, it is the custom and practice to ignore this observation policy to ensure the health and wellbeing of inmates.

30.     After being placed in a cell, Griffin reported side pain and difficulty breathing. His blood pressure was 160/100.

31.     Paramedics from Community Fire Protection District finally were called after Griffin complained of chest pain.  Paramedics arrived at the Jail at approximately 9:52 a.m.

32.     Before the paramedics left the Jail at approximately 9:57 a.m., Defendants were advised that Griffin should be taken to the emergency department for evaluation if he was being held for an extended time.  Defendants knew that Griffin would be held for an extended time due to the reason for his arrest and because they knew St. Louis County had filed criminal charges against Griffin by 5:11 p.m. on September 21, 2022, and therefore would be held for an extended time.  Defendants never took Griffin to the emergency department for evaluation to determine if he was fit for confinement before he died.

33.     Ostoff refused to release Griffin for transport for further evaluation and treatment, acknowledging that Community Fire Protection District's evaluation was not a substitute for treatment by a doctor and was not to be construed as a fit for confinement exam.

34.     Ostoff also refused to release Pinson for proper medical care and treatment on two separate occasions against medical advice before she died in Defendants' custody just a month before Griffin's in-custody death.

35.     When Ostoff refused to release Pinson for necessary medical care and treatment, he knew that he needed to listen to the medics because they were the professionals. Nonetheless, he refused to release Pinson against medical advice, and she died in custody.

36.     Similarly, Ostoff and the other Defendants did not listen to the medical professionals when Griffin was held at the Jail.  Their failure and/or refusal to transport Griffin for a fit for confinement as instructed resulted in his in-custody death only a month after Pinson's death.

37.     Griffin was never taken to an emergency department for evaluation during the 24 plus hours he was held in the Jail before he died, even though he continued to request medical care and his need for medical treatment should have been obvious to Defendants.

38.     When Griffin continued to complain that he was sick after being seen by the paramedics and continued to vomit and have diarrhea, Defendants continued to ignore his obvious medical needs.

39.     Between noon and 10:00 p.m. on September 20, 2022, Griffin told Evans that he was throwing up and had diarrhea and specifically requested to be seen by paramedics.  His request was ignored by Defendants, to include Logan, who was the on-duty supervisor.

40.     Logan was the same supervisor who ignored Pinson's serious medical needs when she died at the St. Ann Jail just a month before.

41.     Before his death, the last face to face visual observation of Griffin occurred at approximately 9:40 p.m.  During the more than 3-hour period before Griffin's death, he pushed the call button at least 5 times and kicked the door numerous times in an effort to get someone's attention, but he was ignored.

42.     Griffin used the call button and/or kicked the cell door to get the attention of the jailers to try to get his medical needs met.  Defendants ignored Griffin's medical needs until it was too late, and he was discovered dead in his cell.

43.     Griffin died in the custody of the City on September 22, 2022, as set forth herein, because Defendants refused to transport him for a proper medical evaluation so that he could get proper treatment, knowing he was sick, while failing to monitor him as required by policy.

44.     The St. Ann Jail has cameras in its cells that provide for the video monitoring of its cells and inmates.

45.     While Defendants claim to monitor the health and wellbeing of its inmates through these cameras, it does not actually conduct the monitoring necessary to ensure the health, safety, and wellbeing of its inmates, to include but not be limited to Griffin and Pinson.

46.     Video shows Griffin repeatedly kicking his cell door (which was ignored) before he began convulsing/spasming in his cell for approximately one and a half minutes the morning of September 22, 2022. No one responded to his cell to check on Griffin or provide necessary medical care when he tried to get the jailers' attention and when he began convulsing/spasming on the video monitor.

47.     Even though Griffin did not move in his cell for over an hour after his convulsion/spasm, no one checked on him in his cell until approximately 2:00 a.m., when it was too late to save him, even though visual observations should have occurred allowing for timely intervention.

48.     While Defendants reported to the medical examiner that Griffin was last seen at about 1:00 a.m., if this were true, he would have been discovered unresponsive shortly after his critical medical event, at a time when proper medical attention was most critical.

49.     Defendants claim to check the wellbeing of inmates every half hour. However, they do not actually do this. By way of example, in the Pinson case, Defendants claimed to have conducted wellness checks of Pinson at 7:37, 8:41, 10:17, 10:40, and 11:16 p.m. Pinson was not even in the cell at or after 7:37 p.m. because she had already been taken to the hospital and pronounced dead.

50.     During Griffin's incarceration, Defendants claimed to have checked him in his cell at 6:13 and 10:27 p.m. on September 20, 2022. Griffin was not arrested until 11:00 p.m. on September 20, 2022, and therefore, no one could have checked him in his cell as claimed.

51.     During this same timeframe, Defendants claimed to have checked on another inmate 3 different times on September 21, 2022. This inmate was not booked into the Jail until 1:30 a.m. on September 22, 2022, showing once again that when Defendants claim to check on

inmates such claims are false.

52. Upon information and belief, no action was taken to ensure that inmates are properly checked even after it was discovered that jailers falsely claimed to have checked on Pinson after she had died.

53. Defendants were aware that Griffin had an objectively serious medical need, which was obvious based on his complaints and condition, to include vomiting and diarrhea as well as the paramedics' directive that he be transported for evaluation if he was going to be held. He was not transported for an evaluation, and therefore, deprived of the medical care and treatment he needed.

54. An autopsy performed by a St. Louis County Medical Examiner stated that Griffin died of fentanyl intoxication, even though Griffin had been in the custody of St. Ann for more than 24 hours before he died.

55. The St. Louis County Medical Examiner also opined that Pinson died from drug intoxication, even though there was no evidence she used any drugs from the time of her arrest on August 19, 2022 and her death on August 22, 2022. Pinson died of a cardiac event, consistent with her complaints ignored by Defendants that she was having chest pain and having a heart attack.

56. Griffin was found to have an 80% blockage of his left anterior descending coronary artery after he died and died of a cardiac event, like Pinson, not of a drug overdose as reported by the St. Louis County Medical Examiner.

57. Defendants individually, and in concert with one another, intentionally, willfully, and maliciously, while acting under color of state law, showed a deliberate indifference to Griffin's serious medical needs, to include his need for transport for a proper medical evaluation

and treatment as directed by the paramedics and/or need for proper observation, in that they had actual knowledge that while confined he had serious medical needs, which they ignored, even when Griffin was vomiting, had diarrhea, requested to be seen by paramedics, and was calling the jailers and pounding his cell door for attention.

58.     Defendants individually, and in concert with one another, through customs and/or practices instituted by them in violation of policy fostered an environment which led to the deliberate indifference to Griffin's serious medical condition in violation of his civil rights, even after another inmate had died in the Jail only a month before due to the City and its employees' deliberate indifference to her medical needs.

59.     As a direct and proximate result of Defendants deliberate indifference to the serious medical needs of Griffin as described above, Woods and Griffin's other heirs at law, have sustained the following damages recoverable pursuant to § 537.090 R.S.Mo.: pecuniary loss suffered as the result of Griffin's death, funeral expenses, and the reasonable value of the services, companionship, comfort, instruction, guidance, counseling, training, and support of which Woods and Griffin's other heirs at law were deprived because of Griffin's death.

60.     As a direct and proximate result of Defendants deliberate indifference to the serious medical needs of Griffin as described above, Griffin suffered great personal injury, pain and suffering, and mental anguish prior to his death, particularly when his requests for medical care were ignored/denied before he died.  Griffin was forced to suffer the deterioration of his condition, severe anxiety, distress and mental anguish, which led to physical and mental suffering prior to his death.

61.     As a direct and proximate result of Defendants deliberate indifference to the serious medical needs of Griffin as described above, Griffin lost his life, and with it the loss of

future income and the enjoyment of life.

62.     Griffin was not the only St. Ann inmate that was not provided necessary medical care while being held at the Jail.  By way of example, but not exhaustive, Tyrus K. Young testified he was not provided medical care for a gunshot wound to his leg while held in the Jail. As set forth above, Pinson died at the Jail just a month before Griffin died, when her serious medical needs were ignored by employees of Defendant City, to include but not be limited Ostoff, Logan, Schwenk, and Jimenez.

63.     Additionally, Defendants have denied medical transport to other inmates against medical advice when transportation was requested/recommended by Emergency Medical Services.

64.     The conduct of the individual Defendants at set forth herein was wanton, willful, and showed a deliberate indifference to Griffin's statutory and constitutional rights, justifying an award of punitive damages against them in their individual capacities so as to punish and deter them and others from engaging in similar civil rights violations in the future.

65.     Additionally, but without waiver of the foregoing, the conduct of the individual Defendants at set forth herein was willful, malicious, oppressive, and reckless to such a degree that punitive damages should be imposed as to Plaintiff's state law claim to punish and deter them and others from engaging in similar misconduct in the future.

**COUNT I**
**Eighth and Fourteenth Amendment Deprivation of Medical Care**
**Cognizable Under 42 U.S.C. § 1983**

For Count I of Plaintiff's cause of action against Defendants Jimenez, Logan, Campos, Schwenk, Means, Ostoff, White, Cox, Lawrence, Evans, Bedsworth, and Miller, Plaintiff states as follows:

66. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of this Complaint.

67. From the time Griffin was taken into custody, he had objectively serious medical needs but Defendants refused to permit his transport from the Jail for proper evaluation and treatment, against the medical advice of the paramedics Defendants called to the Jail.

68. Griffin's medical need was so obvious that even a layperson would easily recognize the need for medical attention. Nonetheless, he was not transported to the emergency department for a proper evaluation as the paramedics instructed Defendants to do.

69. Griffin's serious medical need was apparent to Defendants by his statements and actions, to include repeated vomiting and diarrhea, as well as the medical directive of the paramedics that he be transported out of the Jail for evaluation if Defendants intended to hold Griffin, and his use of the cell call button and pounding on his cell door to get the jailers' attention.

70. Despite Griffin's obvious signs of medical distress, he was not provided proper medical care by Defendants.

71. Despite Griffin's obvious signs of medical distress, pursuant to the City's custom and practice, he was not monitored as required by Jail policy.

72. Reasonable officers would have understood that refusing to transport Griffin for a proper evaluation when paramedics told them this needed to be done and failing to properly monitor Griffin would violate Griffin's constitutional rights, particularly when Pinson had died in Defendants' custody only a month before after also being denied transport to the hospital by St. Ann employees.

73. Defendants deliberately disregarded Griffin's objectively serious medical need.

74.     Defendants knew that Griffin required medical attention, particularly when he continued to call jailers to his cell, even kicking the door for attention when they ignored him, and specifically requested to be seen by paramedics due to his medical condition, which request was ignored by Defendants.

75.     Defendants knew there was a substantial risk that Griffin was in a critical state, particularly when he had diarrhea and vomiting, and the paramedics had already told Defendants that Griffin should be taken for a medical evaluation if he was going to remain in custody.

76.     Defendants Jimenez, Logan, Campos, Schwenk, and/or Means knew that trained medical professionals had told subordinates that Griffin should be transported for medical evaluation, but he remained at the Jail against medical advice, and therefore, approved, condoned, failed to intervene, and/or turned a blind eye to the constitutional violation of their subordinates.

77.     Defendants Jimenez, Logan, Campos, Schwenk, and/or Means knew of the custom and/or practice of correction officers to ignore the Jail's monitoring policy to ensure the health and wellbeing of Jail inmates but did nothing to ensure compliance with this policy, showing deliberate indifference to or tacit authorization of the unconstitutional custom and practice.

78.     Defendants, acting under color of state law, showed deliberate indifference to the serious medical needs of Griffin and his substantial risk of death because of their actual knowledge of his need for medical care, particularly after an inmate had died at the Jail the month before.

79.     The conduct of the individual Defendants at set forth herein was wanton, willful, and showed a deliberate indifference to Griffin's statutory and constitutional rights, particularly

when another inmate had died at the Jail only a month before because Defendants ignored the medical advice of the responding paramedics, justifying an award of punitive damages against them in their individual capacities so as to punish and deter them and others from engaging in similar misconduct in the future.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against the Defendants named herein jointly and severally, and thereafter:

A. Award Plaintiff compensatory damages and damages for aggravating circumstances against Defendants;

B. Award Plaintiff punitive damages;

C. Award Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 or other applicable law; and

D. Allow such other relief as this Court deems appropriate under the circumstances.

**COUNT II**
**Municipal Custom and/or Failure to Implement Appropriate**
**Practices or Customs and Failure to Train, Supervise, and/or Discipline**
**Cognizable Under 42 U.S.C. § 1983**

For Count II of Plaintiff's cause of action against Defendants Chief Aaron Jimenez and City of St. Ann, Missouri, Plaintiff states as follows:

80.     Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of this Complaint.

81.     These Defendants knew they had a duty to provide for the safety and wellbeing of prisoners held in their Jail, to include Griffin.

82.     From the time Griffin was in the City's custody, he had objectively serious medical needs, known to Defendants, but he was not provided a proper medical evaluation or the

medical care and treatment required for his condition, against medical advice to transport him for an evaluation by the emergency department if he was to remain in custody.

83. Additionally, Defendants did not provide proper monitoring of Griffin's serious medical needs to ensure that if his condition worsened he would be provided prompt medical attention.

84. Defendants deliberately disregarded Griffin's objectively serious medical needs by refusing to permit his transport for a proper medical evaluation and treatment, refused his request to be seen by paramedics, when they knew he had diarrhea and was vomiting, and consistent with custom and practice failed to provide proper monitoring of his condition as required by Jail policy.

85. Given Griffin's condition and repeated requests for medical care, as well as the paramedics direction that Griffin be transported for further evaluation, a reasonable officer would have understood that failing to provide proper medical care violated Griffin's constitutional rights.

86. While Jail policy requires a fit for confinement before booking or holding an inmate for interrogation when an arrestee suffers from a possible drug overdose, exhibits symptoms of severe mental disorder, or talks about committing suicide, the custom and/or practice of the Jail is to ignore these obvious needs for medical care and/or treatment, with the knowledge, consent, tacit approval, and/or deliberate indifference of the City and those with final policymaking authority.

87. Similarly, while Jail policy requires face-to-face visual observations every 30 minutes and audio/video monitoring between the check-ins, the custom and/or practice of the Jail is to ignore this monitoring to the detriment of the health and wellbeing of inmates, with the

knowledge, consent, tacit approval, and/or deliberate indifference of the City and those with final policymaking authority.

88.     These Defendants implemented customs and/or practices related to the medical care of persons held in the City's custody that allowed untrained City employees to make medical decisions about prisoners that they were not qualified to make, even when against the medical advice of trained medical personnel.

89.     These Defendants have a custom of calling Emergency Medical Services to provide medical care for sick/injured inmates because the jail is not properly staffed to meet the medical needs of its inmates, and then refusing to permit inmates to be transported for medical evaluation and/or treatment, even when recommended/requested by the Emergency Medical Services called by Defendants to render aid.  As a result, the Defendants have a custom of denying medical care/treatment and/or of displaying deliberate indifference to such denials.

90.     Additionally, these Defendants have no effective way to determine whether inmates are routinely denied necessary medical care/treatment, even after Emergency Medical Services are called, showing deliberate indifference to this custom of failing to provide medical care/treatment to inmates by turning a blind eye to any issues/problems, thereby displaying deliberate indifference to or tacit authorization of the denial of medical care/treatment.

91.     Additionally, these Defendants took no corrective action, to include but not be limited to disciplinary action, when Pinson died in custody the month before.  Instead of taking corrective action, the City took actions to cover-up and protect itself and its agents/employees from the consequences of their actions, showing tacit authorization of its agents/employees deliberate indifference to the serious medical needs of inmates.

92.     Additionally, but without waiver of the foregoing, upon information and belief,

these Defendants trained their subordinates that they could make medical decisions about prisoners that they were not qualified to make, even when against the medical advice of trained medical personnel, and they were not required to get a fit for confinement when inmates complained of serious medical conditions.

93. Additionally, upon information and belief, these Defendants trained their subordinates that they did not have to monitor the health and wellbeing of inmates consistent with Jail policy.

94. Defendants' customs, practices, training and/or inadequate training resulted in the deprivation of Griffin's constitutional rights.

95. Defendants' custom, practice, and/or training to ignore medical needs and to refuse to permit an inmate to leave the jail for proper evaluation and medical care, even when against medical advice, deprived Griffin of his constitutional rights.

96. Additionally, Defendants' custom, practice, and/or training to ignore its inmate monitoring policy deprived Griffin of his constitutional rights.

97. Alternatively, but without waiver of the foregoing, Defendants' failure to have adequate practices, training, or supervision to meet the medical needs of inmates resulted in the violation of Griffin's constitutional rights.

98. Defendants failed to train, supervise, and discipline staff on the rights of inmates with serious medical needs, even after Pinson died in custody, thereby demonstrating a deliberate indifference to Griffin and other inmates.

99. The failure to train amounts to a deliberate indifference to the rights of persons incarcerated in the Jail, to include Griffin.

100. Upon information and belief, correctional officers and supervisors, who are not

medical professionals and were inadequately trained, were allowed to assess the medical needs of inmates held at the Jail against the medical advice of trained professionals, resulting in the death of Griffin.

101. Upon information and belief, Defendant Jimenez was the highest ranking official to supervise the Jail and was responsible for setting and implementing City policy with respect to the Jail, and therefore, had final policymaking authority.

102. From the early morning hours of September 21, 2022 until his death in the early morning hours of September 22, 2022, Griffin was an inmate under the care, custody, and control of Defendants, who was in need of medical care, of which Defendants through their employees and agents knew, but did not provide appropriate medical care.

103. Defendants City and Jimenez implicitly or explicitly adopted and implemented customs or practices, that included among other things, allowing correction officers to ignore health and wellbeing checks and allowing correction officers with no or inadequate training to assess the medical needs and conditions of inmates and deny medical care to those with serious medical needs, even when against medical advice, to include Pinson and Griffin, which customs, or practices reflected a deliberate indifference to the serious medical needs of Griffin.

104. The failure of these Defendants to enforce policies and procedures that would provide Griffin with reasonable medical care and/or to properly train or discipline jail personnel, and/or or to allow for customs and/or practices that deprived Griffin of regular wellness checks, a fit for confinement evaluation, and necessary medical care amounted to deliberate indifference to Griffin's serious medical needs, particularly after Pinson had died in the Jail only a month before, which upon information and belief resulted in no corrective actions to prevent future deaths.

105.     Upon information and belief, at the time that Griffin was incarcerated in the Jail, it was the custom and/or practice of the Defendants to inadequately train and supervise corrections officers and other personnel with supervision of the Jail on providing for the serious medical needs of inmates, thereby evidencing a deliberate indifference to Griffin's constitutional rights.

106.     The need for training the City's officers/agents to deal with the serious medical needs of inmates was obvious in light of the number of emergency calls made by Defendants to the Jail, as well as the in-custody death of Pinson the month before.  The lack of training by Defendants was so inadequate that it was likely to result in violating the constitutional rights of inmates like Griffin.

107.     Defendants' failure to train, supervise, or discipline its staff in the proper medical care/treatment to be provided to inmates' medical needs, to require them to follow the medical advice of trained medical professionals, and/or to provide necessary health and wellness checks constituted a tacit authorization of the acts complained of herein.

108.      The purported investigations into the deaths of Pinson and Griffin also demonstrated Defendants explicit or tacit authorization of the violation of Griffin's constitutional rights.

109.     These Defendants, acting under color of state law, showed deliberate indifference to the serious medical needs of Griffin and his substantial risk of death after having actual knowledge of his need for a proper medical evaluation and medical care through their employees/agents, particularly after Pinson had died at the jail only a month before.

110.     As a direct and proximate result of the violation of Griffin's constitutional rights by the Defendants named herein, Plaintiff suffered the damages set forth above and is entitled to

relief for the deprivation of Griffin's constitutional rights.

111. The conduct of Defendant Jimenez in his individual capacity at set forth herein was wanton, willful, and showed a deliberate indifference to Griffin's statutory and/or constitutional rights, justifying an award of punitive damages against him in his individual capacity so as to punish and deter him and others from engaging in similar misconduct in the future.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against the Defendants named herein jointly and severally, and thereafter:

    A. Award Plaintiff compensatory damages and damages for aggravating circumstances against Defendants;

    B. Award Plaintiff punitive damages against Defendant Jimenez in his individual capacity;

    C. Award Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 or other applicable law; and

    D. Allow such other relief as this Court deems appropriate under the circumstances.

## COUNT III
## Wrongful Death

For Count III of Plaintiff's cause of action against all Defendants except the City, Plaintiff states as follows:

112. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of her Complaint.

113. Defendants owed a duty to ensure the safety and wellbeing of inmates and detainees at the Jail, to include a duty of care to Griffin. This included the duty to provide

adequate medical care and/or to transfer inmates to a facility that could provide an adequate medical evaluation and care when told to do so, and/or to provide necessary health and wellness checks.

114.    Defendants breached their duty of care to Griffin by the acts and/or omissions set forth in detail above, which are incorporated by reference herein.

115.    Defendants' breach of their duty of care to Griffin was the cause in fact and proximate cause of his death.

116.    Woods is entitled to recover fair and reasonable damages against Defendants as provided by § 537.080 R.S.Mo. for the wrongful injuries to and wrongful death of Griffin, including special damages for his funeral and burial.

117.    From the beginning of his detention until his death, Griffin suffered physical and mental pain as a direct and proximate result of Defendants' breach of their duty of care.

118.    Additionally, Woods and Griffin's other heirs at law have been deprived of Griffinn's valuable companionship, comfort, love, and affection as a result of his untimely and unnecessary death.

119.    The acts/omissions of the individual Defendants were not discretionary when trained emergency medical personnel told Defendants that he should be transported for evaluation by an emergency department if he was going to be held because Defendants intended to hold Griffin and did hold him without a fit for confinement against medical advice.

120.    The acts/omissions of the individual Defendants were not discretionary because Jail policy required Griffin to be transported for a fit for confinement and required face to face visual observations every half hour and audio/video checks between the 30 minute visual observations.

121.    The conduct of the individual defendants in their individual capacities as set forth

herein was willful, malicious, oppressive, and reckless, justifying an award of punitive damages against them in their individual capacities so as to punish and deter them and others from engaging in similar misconduct in the future.

WHEREFORE, Plaintiff prays this Court to enter judgment in her favor and against the Defendants named herein jointly and severally, and thereafter:

A.      Award Plaintiff compensatory damages and damages for aggravating circumstances against Defendants;

B.      Award Plaintiff punitive damages against the individual defendants in their individual capacities;

C.      Award Plaintiff her costs expended herein; and

D.      Allow such other relief as this Court deems appropriate under the circumstances.

Respectfully submitted,

**PETRUSKA LAW, LLC**


By:      _____/s/ Lynette M. Petruska_____
          Lynette M. Petruska, Bar No. 41212
          lpetruska@att.net
          1291 Andrew Dr.
          Glendale, MO 63122
          314-954-5031

**LABOVITZ LAW FIRM**



By:        /s/ Brent Labovitz
              Brent Labovitz, Bar No. 61468
              brent@bellawfirm.com
              1034 S. Brentwood Blvd, Suite PH-2B
              St. Louis, MO 63117
              314-726-1300
              314-627-4522

              Attorneys for Plaintiff


## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing was served via the Court's ECF System this 7th day of January, 2025, upon all attorneys of record.


              /s/ Lynette M. Petruska